## WALTER C. SMITH.

*vs.*

## MAINE CENTRAL RAILROAD COMPANY.

Piscataquis.    Opinion March 20, 1895.

*Railroads.    Highway Crossings.    Negligence.*

It is the established law in this State, and of courts generally, that persons attempting to cross a railroad track without stopping to look or listen are presumed to be guilty of negligence.

In backing cars over highway crossings, a railroad company is only required to provide signals and safeguards so timely and abundant that they may reasonably be expected to prove effectual in warning travelers who are themselves in the exercise of due care and vigilance; it is not bound to adopt such extraordinary measures as might be needful to warn travelers who are thoughtless and inattentive or reckless and venturesome.

Where the plaintiff assumed the duties of a look-out, in attempting to pass over a railroad crossing and saw the head-light of the engine but made no mention of it to his companion, who was driving the team, and neither asked the driver to stop nor to hurry forward, *held;* that it is the duty of the passenger when he has opportunity to do so, as well as the driver, to learn of danger and avoid it if practicable.

In this case the verdict was set aside, it appearing that they both saw and heard the approaching train but rashly undertook to cross the track instead of waiting for the train to pass.

*Held;* that if the noise of their carriage and of the pattering rain upon its top rendered it difficult to distinguish the sounds, it was their plain duty to stop the team and obtain a better opportunity to hear.

ON MOTION.

This was an action on the case in which the plaintiff recovered a verdict for personal injuries received in a collision of his carriage with the defendant's freight train, consisting of four freight cars and one saloon car, while making a flying switch after dark at the Summer street crossing, near defendant's station in Foxcroft, Piscataquis county, in the evening of November 23, 1891.

The principal allegations of negligence charged in the plaintiff's declaration were the running the train in this way with the locomotive behind, and without either a gate, or a flagman, or any person at the crossing to give signals, as follows : "When said plaintiff was crossing the said side-track of said railroad, which said side-track crossed the highway aforesaid, near said station and yard, said four cars, without any engine attached thereto or any signal or warning given of their approach, which said cars belonged to and were under the management, direction and control of said defendant corporation, and were run by said defendant corporation, ran into and over the carriage in whicq said plaintiff was then and there riding and threw the plaintiff with great violence and force upon the ground and ran over him. . . .

"And the plaintiff says that the defendant corporation was guilty of great negligence and carelessness, and that in consequence of said negligence and carelessness he, said plaintiff, was run over and injured as aforesaid. And the plaintiff further says that said corporation gave no proper and legal notice or warning of the approach and passing of said cars across said highway at the time of said injuries, nor did they in any manner give any legal and proper caution to travelers of the existence of said railroad crossing, and took no proper precaution to warn travelers of the approach of said cars and to protect them from harm and injury, as was their duty to do, and that said defendant corporation were guilty of great carelessness and negligence in the management of said railroad, and the trains run upon the same, in running said train into said station in the manner aforesaid, and in not giving notice and warning as aforesaid, and in not guarding properly against collision with those who

were crossing said railroad over said highway, whereby said plaintiff was injured as aforesaid."

The case is stated in the opinion.

*Henry Hudson and Frank E. Guernsey*, for plaintiff.

Reasonable care and prudence and a just regard to the rights of the traveler required that a gateman, or flagman, should have been maintained by said defendant. On account of the peculiar method and manner of running its train that night, a high measure of duty on the part of the railroad company was incumbent. It was not sufficient simply to establish sign boards at their street crossings, ringing the bell, or blowing the whistle, or the placing of a man upon the front end of the head car with a lantern. If the company saw fit to exercise the right to run its train in the way in which it did, it must take extraordinary means and measures to protect the traveler. The statute requirements had they all been complied with, except the single requirement of a gateman or flagman on the crossing, would not be a sufficient compliance with the law. The law itself is just as stringent and inflexible, founded upon the common law and the plainest right and duty, that such precaution must be taken and exercised by the defendant notwithstanding the existing statute in this state. *Grippen* v. *N. Y. C. R. R.* 40 N. Y. p. 42.

The law contemplates that such engine is to be attached to the train, and so attached as to give reasonable warning of the approach of such train. The peculiar manner in which this train was allowed to pass into the station that night, with the engine in the rear and detached,—the ringing of the bell not only did not serve as a warning to the traveler, but tended to deceive. A traveler in passing over the highway upon a night as dark as this night was, had he heard the bell rung two hundred feet or more distant from the crossing, would have been deceived thereby. *State* v. *B. & M. R. R.* 80 Maine, 440.

Counsel also cited: *French* v. *Taunton Branch R. R.* 116 Mass. 537 ; 1 Thomp. Neg. 424, and cases : *Brown* v. *N. Y. C. R. R.* 32 N. Y. 596, 601 ; *Eaton* v. *Erie Ry. Co.* 51 N. Y. 544 ; *Del. R. R. Co.* v. *Converse*, 139 U. S. 467 ; *York* v. *M. C. R. R. Co.* 84 Maine, p. 123 ; *Bonnell* v. *D. L. & W. R. R.*

39 N. J. L. 189; *Robinson* v. *N. Y. C. & H. R. R. R. Co.*
66 N. Y. 12; Same, 84 N. Y. 247; *Maginnis* v. *Same*, 52 N.
Y. 215; *Ernst* v. *H. R. R. R.* 35 N. Y. 37.

*C. F. Woodard and J. B. Peaks*, for defendant.

SITTING: PETERS, C. J., EMERY, FOSTER, WHITEHOUSE,
STROUT, JJ.

WHITEHOUSE, J. The plaintiff recovered a verdict of $4,191,
for a personal injury received in a collision of the defendant's cars
with the carriage in which the plaintiff was riding at the Summer
street crossing, near the defendant's station in Foxcroft, on the
23rd day of November, 1891, and the case comes to the law
court on a motion to set aside this verdict as against evidence,
and for newly-discovered evidence.

It is the opinion of the court that, under the settled law of this
state, the verdict was not justified by the evidence introduced at
the trial and cannot be permitted to stand.

The accident occurred on the arrival of the defendant's mixed
train, at its terminal station in Foxcroft, a few minutes past six
o'clock in the evening. The plaintiff, a resident of Brownville,
had accepted an invitation from Louis H. Ryder of that place,
to ride with him to Monson by way of Foxcroft and Dover.
They had for a team a pair of heavy, old work-horses and a top
buggy. The plaintiff was twenty-seven years of age, and after
his return from Massachusetts, in September, had been working
for his father trucking about the depot at Brownville. Ryder
was a stable keeper, thirty-one years of age, who was seeking an
opportunity to exchange the two old horses for a driving horse.
They started about two o'clock in the afternoon, but called at the
Brownville station and obtained a box containing a two-quart
jug of Tarragona port wine and a bottle containing from a pint
and a half to a quart of Irish whiskey. This box was opened
about a mile and a half from Brownville. They drove to Milo a
distance of four miles in about an hour, from Milo to South
Sebec, five miles, in about an hour and a quarter, and from South
Sebec to Foxcroft, seven miles, in about an hour, having made

three stops on the way of about fifteen minutes each. They approached Foxcroft in a southerly direction along the thoroughfare there known as Summer street. This highway passes by the westerly end of the Maine Central station grounds and there intersects four railroad tracks : first, the main track of the Bangor & Aroostook railroad ; second, forty-three feet southerly therefrom, the main track of the defendant company ; third, fifty-three feet from its main track, the defendant's side-track, and three and one-half feet farther south the defendant's second side-track. The collision took place on the defendant's side-track fifty-three feet southerly from its main line, on Summer street as stated. This street as it approaches and crosses these several railroad tracks, is practically level.

The next street westerly from Summer street is Spring street, which is three hundred and twenty-five feet distant from Summer street, measured on the defendant's main line, or two hundred and forty-five feet measured along the side-track. The next street westerly is called North street which is five hundred and seven feet distant from Spring street. Mechanic street is next westerly from North street, eight hundred and seventy feet distant from it, and the Spool factory is five hundred and seventeen feet westerly of Mechanic street.

The railroad track is on a down grade from the Spool factory to North street with a descent of little more than a foot in a hundred, while from North street to Summer street the grade falls only four and four-fifths inches.

The defendant's railroad is plainly visible from the scene of the accident up to the Spool factory a distance of two thousand one hundred and thirty-nine feet. The entire line back to the Spool factory may also be plainly seen from a point in Summer street one hundred and eighty feet northerly from the place of collision and all the way, along which the plaintiff was approaching, from that point to the place of the collision. From a point in Summer street, two hundred and sixty feet northerly from the place of the accident and all the way from that point to the scene of the accident, there is an unobstructed view of the track as far west as Spring street.

Such being the situation on the evening of the accident, the defendant's mixed train, consisting of an engine with four freight cars, and one combination car with a passenger compartment containing six or eight passengers, arrived at the outer limits of the railroad yard, some thirty rods west of the Spool factory, about six o'clock, being substantially on schedule time. The whistle was sounded as usual at the Spool factory, and thereafter the bell on the engine was continuously rung until the time of the accident. The train came to a full stop at Mechanic street and there in accordance with an established usage, in order that the cars might be run down across Summer street into the station grounds in advance of the engine and thus be left in a situation convenient and available for use thereafter, the engine was detached and run on to a long siding, while the five cars, the brakes being relieved, ran down on the main track by force of their own gravity, the engine following along on the siding and thence on to the main track again in the rear of the cars. The train then proceeded down the main line across North street and Spring street until it came to the switch fifty feet easterly from Spring street, which controls the junction of the side-track with the main line, where it went on to the side-track towards the place of the accident, the engine being from one hundred to two hundred feet in the rear of the cars, with the bell continually ringing. On the top of the head car at the front, as the train proceeded, a brakeman with a lantern was stationed by the brake. There was another brakeman at the brake on the front end of the combination car; and the conductor was also in that car.

The combination car had twelve windows on each side and the interior was lighted by six large lamps. It was also provided with two large rear-lamps on the outside, set in brackets five or six inches from the car, with reflectors showing red light from the rear and white from the front. The engine showed its headlight as it followed along behind the cars.

The speed of this train on the comparatively level grade east of Spring street does not appear to have exceeded four miles an hour.

In the meantime the plaintiff and Ryder were approaching on the highway leading into Summer street. It was cloudy and dark with an occasional light fall of rain, and the curtains of the top buggy were closed at the back and on the sides ; but the occupants of the carriage were so boisterous as to attract the special attention of three witnesses who saw the team at points from three to four miles north of the railroad station, and heard the men "hollering and singing and whipping up the horses." One of these witnesses says when he saw them they were driving "very reckless and fast." Two other witnesses saw the team and heard similar noises only a mile and a half distant from the station. But the plaintiff and Ryan say they drank but twice of the whiskey and only once of the wine, and deny that they were at all under the influence of liquor when they arrived at the station. According to their testimony they were driving very slowly as they drew near the defendant's station, and when within one hundred and fifty feet or less of the Bangor and Aroostook track, they saw the lights in and about the station buildings and on the covered platform and recognized the Maine Central station. They were familiar with the location of the Bangor and Aroostook railroad, but drove across that track without stopping to look or listen. Immediately after crossing, however, they say they "pulled up" and stopped the team, and both "looked up and down the track." They were then within one hundred feet of the point of collision, and it is shown by the data already presented that the train of cars was at that moment coming slowly down the side-track, the head of it probably within one hundred and twenty-five feet and the rear within three hundred feet from Summer street, where it crosses this side-track at nearly right angles. The hypothenuse of each triangle being found, the team appears to have been about one hundred and sixty feet from the head of the train, and three hundred and sixteen from the rear of it. At these distances there was then presented to the view of the plaintiff and his companion, not simply the lighted lantern of the brakeman of the forward car, but the whole side of the combination car lighted from within by lamps, and by a large rear light on the outside. The head-

light of the engine some two hundred feet farther back, was also plainly visible. Besides, there were two switch-lights at this crossing, one above and one below the street. The ringing of the engine bell, which still continued, and the rumbling of the moving train, could be distinctly heard in that vicinity. But although the carriage was not then in motion, and the plaintiff and Ryder were both young men of unimpaired sight and hearing, they say they neither saw nor heard anything to indicate the approach of an engine or cars. They both "guessed that everything was all right" and Ryder who held the reins, drove along across the main track at a pace "between a walk and a trot." The team and train were thus moving towards the place of collision at substantially the same moderate rate of speed. When the team had passed the main track, the plaintiff, who was sitting on the left side, says he leaned forward and looked up the track and saw the headlight of the engine, but said nothing to Ryder about it.

An examination of the plans in connection with the measurements in evidence, shows that the line of vision between the plaintiff at that point and the point where the engine was, must have been obstructed by the cars moving around the curve of the side-track ; and it is therefore much more probable that the plaintiff saw the headlight before he crossed the main track, when there was still more time to weigh its significance. But assuming that he was looking out and saw it after crossing the main track, he was then within fifty or sixty feet of the train of cars, and the lantern held by the brakeman on the front car and the lighted combination car were still more clearly exposed to his view. The brakeman saw the team as it passed over the main track in the light from the defendant's station buildings, and repeatedly shouted a warning for it to stop. At the same instant, by swinging his lantern he gave to the brakeman on the rear car the conventional signal to set the brake, which was promptly obeyed, and thereupon immediately set his own brake. But it was too late to stop the train in season to avoid a collision with the team. The plaintiff and Ryder say they heard no warning and saw no signals. But the lights of the approaching train, either before or after it reached the side-track, were

plainly seen by eight witnesses, four called by the plaintiff, and four by the defendant, and by every witness. who was in a position where he could be expected to see them. The ringing of the bell and the rumbling of the cars were heard by five witnesses, some of them less favorably situated than the plaintiff. The warning shouted from the top of the forward car was distinctly heard by eight witnesses, three called by the plaintiff and five by the defendant. But the plaintiff and Ryder attempted to cross the side-track without stopping to look or to listen, and say they heard neither the ringing of the bell, the rumbling of the cars, nor the shouts of the brakeman.

When a railroad track crosses or is crossed by a highway, the traveler with a team and the railroad company have concurrent rights and mutual obligations with respect to the use of the way at the place of intersection. But inasmuch as a railroad train runs on a fixed track, and readily acquires a peculiar momentum, it cannot be expected that when once in motion, it will stop and give precedence to a team approaching on the highway. It cannot be required to do so, except in cases of manifest danger where it is apparent that a collision could not be otherwise avoided. It is the duty of the traveler on the highway to wait for the train. The train has the preference and the right of way. *Continental Improvement Co.* v. *Stead*, 95 U. S. 161; 2 Wood on Rail. 1510; Pierce on Rail. 342; *Lesan* v. *M. C. Railroad*, 77 Maine, 84.

It follows that a collision at a railroad crossing on the highway raises no presumption of actionable negligence on the part of the railroad company or its servants. It is rather *prima facie* evidence of negligence on the part of the traveler. *Hooper* v. *B. & M. Railroad*, 81 Maine, 260. "One in the full possession of his faculties who undertakes to cross a railroad track at the very moment a train of cars is passing, or when a train is so near that he is not only liable to be, but in fact is struck by it, is *prima facie* guilty of negligence, and in the absence of a satisfactory excuse, his negligence must be regarded as established." *State* v. *M. C. Railroad*, 76 Maine, 358; *State* v. *Same*, 77 Maine, 538.

The burden was, therefore, on the plaintiff to establish by affirmative evidence, not only the negligence of the defendant company but his own freedom from contributory negligence. It was incumbent upon him to show that, with respect to some of the charges specified in his writ, the defendant's servants had omitted to do something which an ordinarily prudent person in the same relation would have done, or did something at that time which a reasonably prudent person, under similar circumstances, having due regard to the rights and interests of others, would not have done. It was also incumbent upon him to show that he himself approached the crossing with due care and caution, alert to discover the first sign of coming danger.

It is not contended that there was any failure on the part of the defendant to observe the requirements of the statute respecting the signals and safeguards designed to warn and protect the traveler. As the rate of speed at which the train was moving did not reach six miles an hour, the defendant was not required by statute to have gates maintained or a flagman stationed at Summer street crossing; and it is conceded that the whistle was sounded and the bell rung in substantial compliance with the statute.

But the statutes prescribing these special duties are little more than an affirmation of the rules of the common law. They do not constitute the sole measure of duty. The common law still requires the exercise of care and prudence commensurate with the degree of danger incurred. The statutes represent the minimum degree of care to be observed, and do not release the company from the obligations to take such additional precautions as the peculiar circumstances of the case may demand. 2 Wood on Rail. 1513, and cases cited. *Lesan* v. *M. C. R. supra.*

The plaintiff accordingly claims that the dangers incurred by the defendant's peculiar manner of running its train into the Foxcroft station, with the engine detached from the cars and far in the rear, were such as to require a flagman or gates to protect travelers at the Summer street crossing; and that in the absence of these safeguards, the operation of the defendant's

train on the evening in question, was not conducted with due regard to the safety of travelers on the crossing. He insists that the defendant's premises in that vicinity were inadequately lighted; that the head-light on the engine and the ringing of the bell so far in the rear were calculated rather to mislead than to direct, and that the lantern held by the brakeman on the forward car and the lighted combination car were insufficient on so dark an evening to give notice that a train of cars was approaching the crossing.

The comprehensive rule, applicable to this class of questions, is well stated in 2 Wood on Railroads, 1517, as deducible from all the authorities : "It is not necessarily negligence on the part of railroad company to back and switch cars over a highway crossing, nor to make "flying switches" there; it has a perfect right to make such a use of that part of the track, provided proper precautions are taken for the safety of travelers using the crossing. But as a matter of common knowledge such a practice is peculiarly dangerous, and therefore creates a duty of unusual care on the part of the company. There should be abundant warning, not only by the usual signals of bell and whistle, but there should be a flagman near the track, or a watchman on the nearest approaching car to warn travelers who are near." See also *Delaware, L. & W. R. Co.* v. *Converse*, 139 U. S. 469; *York* v. *M. C. R.* 84 Maine, 123. But in such case the railroad company is only required to provide signals and safegards so timely and abundant that they may reasonably be expected to prove effectual in warning travelers who are themselves in the exercise of due care and vigilance; it is not bound to adopt such extraordinary measures as might be needful to warn travelers who are thoughtless and inattentive or reckless and venturesome. The defendant earnestly contends that the signals and safeguards provided in this case ought to be deemed ample and effectual to give notice of the approach of the train to all travelers who were looking and listening for it as they were required by law to do.

Assuming that there was a greater weight of evidence in favor of the defendant on that proposition, we should hesitate

to declare that the finding of the jury with respect to it was so manifestly wrong as to justify us in setting aside the verdict on that ground.   But we are satisfied that the accident was not the result of any neglect on the part of the defendant or its servants to provide suitable safeguards, or of any failure to give timely and sufficient warning by signals or otherwise, of the approach of the train.   It was undoubtedly caused, directly and proximately, by a want of due care and prudence on the part of the plaintiff himself.   True, the plaintiff was not in control of the team as driver, but was riding by a friendly invitation from Ryder and without other compensation than his companionship. But the rule that the negligence of the driver is not to be imputed to his companion under such circumstances has very little application to the facts of this case.   The plaintiff was occupying the same seat with Ryder and had the same opportunity, and after they reached the defendant's main track,— probably a better opportunity, for discovering dangers.   Before reaching the Bangor & Aroostook track they conversed about the lights of the defendant's station, and after crossing stopped and had the further conference at which they agreed in "guessing that everything was all right." It is obvious that the driver was ready and willing to act upon any information or suggestion from his companion.   It is clear also that the plaintiff instinctively felt that there was a responsibility resting upon him as well as upon the driver.   He knew that they were crossing railroad tracks, and was bound to know that a railroad track is itself a warning, and a crossing a place of danger.   He admits that when within fifty feet of the collision he voluntarily assumed the duties of a lookout.   He saw the head-light, which Ryder does not appear to have seen, but did not mention the fact to Ryder.   The horses were steady and well trained and would have promptly heeded the word to stop either from the plaintiff or the driver.   But the plaintiff neither asked the driver to stop the horses nor to hurry them forward.   His conduct was not that of a reasonably prudent man.   It is the duty of the passenger, when he has the opportunity to do so, as well as of the driver, to learn of danger, and avoid it if practicable.

*Brickell* v. *N. Y. C. & H. R. R. Co.* 120 N. Y. 290; *State* v. *B. & M. R.* 80 Maine, 445.

They attempted to cross the defendant's side-track without stopping to look or listen. But "the rule is now firmly established in this state, as well as by courts generally, that it is negligence *per se* for a person to cross a railroad track without first looking and listening for a coming train. If his view is unobstructed he may have no occasion to listen. But if his view is obstructed, it is his duty to listen and listen carefully. And if one is injured at a railroad crossing by a passing train or locomotive which might have been seen if he had looked, or heard if he had listened, presumptively he is guilty of contributory negligence; and if this presumption is not repelled, a recovery for the injury cannot be had." *Chase* v. *M. C. R. R. Co.* 78 Maine, 353. "No neglect of duty on the part of a railroad company will excuse anyone approaching such a crossing from using the senses of sight and hearing where those may be available." 1 Thomp. Neg. 426.

It is inconceivable, indeed, that if they had looked attentively, without stopping, after crossing the main track, they should not have seen the lights of the approaching train, which so many others in the vicinity clearly saw. It is almost incredible that if they had listened carefully they should not have heard the rumbling and jolting of the approaching cars which so many others distinctly heard. If the noise of their carriage and of the pattering rain upon its top, rendered it difficult to distinguish the sounds, it was their plain duty to stop the team and obtain a better opportunity to hear. If they had done so, they must have seen and heard the trains, and avoided the collision. No reasonably prudent man under such circumstances, would have neglected so to do.

But the inference from all the evidence is almost irresistible that they did both see and hear the approaching train, but with an absence of caution and freedom from anxiety resulting in some degree from the effect of intoxicating liquors, rashly undertook to cross the track instead of waiting for the train to pass. If so, "the consequences of such mistake and temerity

cannot be cast upon the company. No railroad company can be held for a failure of experiments of that kind; and if one chooses, in such a position to take risks, he must bear the consequences of failure." *Chicago, &c., R. R. Co.* v. *Houston*, 95 U. S. 697.

In either view the contributory negligence of the plaintiff is clearly established.

*Motion sustained. Verdict set aside.*